UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

STEVE HELLERSTEIN, *et al.*,

        Plaintiffs,

     v.

DESERT LIFESTYLES, LLC, *et al*.

        Defendants.

Case No. 15-cv-01804-RFB-CWH

**PRELIMINARY INJUNCTION**

## I.      BACKGROUND

This case is before the Court on Plaintiffs' Motion for Preliminary Injunction, filed on September 7, 2015 in Nevada state court. Pet. for Removal Ex. B, ECF No. 1. For the reasons discussed below, the Court grants Plaintiffs' motion and issues a Preliminary Injunction against Defendant Desert Lifestyles, LLC.

Plaintiffs are (1) residents of the Silverstone Ranch Community, a common interest community located in northwest Las Vegas, Nevada ("Homeowners"), and (2) the Silverstone Ranch Community Association, a homeowners' association comprised exclusively of Silverstone homeowners ("Silverstone HOA"). Defendants are Desert Lifestyles, LLC ("Desert Lifestyles") and Western Golf Properties, LLC ("Western Golf"). Desert Lifestyles is the owner of the golf course located within the Silverstone Ranch Community (the "Golf Course"). Western Golf manages and maintains the Golf Course.

Plaintiffs brought this action in Nevada state court seeking to enforce the terms of a certain Second Amended and Restated Reciprocal Easement Agreement and Covenant to Share Costs ("Golf Course Agreement") against Desert Lifestyles and Western Golf. In their

Complaint and Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiffs assert that Desert Lifestyles purchased the Golf Course on September 1, 2015 and, as owners of the course, are bound by the Golf Course Agreement to maintain and operate the Golf Course as a 27-hole championship golf course in perpetuity or until 75% of the homeowners approve a different use. Plaintiffs further allege that Desert Lifestyles—and Western Golf, whom Desert Lifestyles engaged to manage the Golf Course—subsequently closed the Golf Course to the public, erected a fence around the clubhouse, and turned off the water to the course. As a result, Plaintiffs allege that as of September 7th, the grass on the Golf Course had begun to die and that the water features had begun to lose significant amounts of water.

A Temporary Restraining Order was entered in state court on September 8, 2015, after which the case was removed to this Court. Following a two-day hearing, this Court issued a second Temporary Restraining Order on September 26, 2015. The Court then held a three-day hearing on whether a preliminary injunction should issue on October 13 and November 2-3, 2015.

Based upon the evidence presented at the hearing and the entire record in this case, the Court makes the following findings of fact and conclusions of law and issues a preliminary injunction against Desert Lifestyles.[1] The preliminary injunction requires Desert Lifestyles to maintain the Golf Course in the condition it would have been in had it been continuously watered and maintained as of September 1, 2015 (the status quo date). However, it does not require Desert Lifestyles to operate the Golf Course as a business.[2]

---

[1] This Preliminary Injunction is not issued against Defendant Western Golf. As the Court will discuss, Western Golf is not specifically bound by the terms of the Golf Course Agreement. Therefore, although this Order makes certain references to both Defendants when discussing the facts of the case, the Preliminary Injunction applies only to Desert Lifestyles. Nevertheless, Western Golf will be required to comply with the Preliminary Injunction to the extent it manages and maintains the Golf Course as the agent of Desert Lifestyles.

[2] The Court announced its preliminary ruling in open court on November 3, 2015, in which it stated its findings of fact and conclusions of law on the record and advised the parties that a written order would be forthcoming. To the extent this Order is inconsistent with the Court's preliminary ruling on November 3, 2015, this Order controls.

- 2 -

## II.  FINDINGS OF FACT

1.      The Silverstone Ranch Community ("Silverstone") is a planned community located in Las Vegas, Nevada comprised of some 1,520 homes built around the Golf Course. Approximately 747 of the Silverstone homes either border the Golf Course or feature a prominent view of the Golf Course from across the street. The Golf Course spans approximately 272 acres and currently features 27 holes.

2.      The Silverstone homes were designed and built by PN II, Inc. d/b/a Pulte Homes of Nevada ("Pulte Homes") between 2002 and 2004.

3.      On June 14, 2002, Pulte Homes executed a Declaration of Covenants, Conditions and Restrictions ("CC&Rs"), which binds all Silverstone homeowners to certain obligations and provides that they shall each be members of the Silverstone HOA, which shall be comprised exclusively of Silverstone homeowners. The CC&Rs were recorded on June 14, 2002.

4.      Also on June 14, 2002, Pulte Homes entered into the Golf Course Agreement with the then-owner of the Golf Course, Meadowbrook Mountain Spa, LLC. The Golf Course Agreement was recorded on June 14, 2002. By its own terms, the Golf Course Agreement creates an easement and restrictive covenant attached to the Golf Course property.

5.      At least as early as June 2015, Desert Lifestyles began negotiations to purchase the Golf Course from Par 72, LLC, the previous owner of the course. The sale between Desert Lifestyles and Par 72 was closed, and Defendants took possession of the Golf Course, on September 1, 2015.

6.      At least as early as July 2015, Desert Lifestyles had actual knowledge and possession of the CC&Rs for Silverstone and of the Golf Course Agreement, which plainly states that the Golf Course is to be operated and maintained solely as a 27-hole golf course unless another use is approved by at least 75% of the homeowners.

7.      At least as early as August 20, 2015, Desert Lifestyles also had actual knowledge of prior litigation involving the Golf Course, which was brought by the Silverstone HOA against Par 72 to enforce the terms of the Golf Course Agreement. Desert Lifestyles fully anticipated being brought into this lawsuit upon taking ownership of the Golf Course and it did not

anticipate that the suit would be resolved prior to taking ownership.

8.      Desert Lifestyles entered into a Purchase and Sale Agreement with Par 72 on August 7, 2015. Prior to the closing of the sale, and at least as early as August 21, 2015, Desert Lifestyles and Par 72 discussed the issue of providing notice to Plaintiffs regarding the impending sale of the Golf Course and informing Plaintiffs that Desert Lifestyles intended to close the Golf Course after the sale was completed. However, Desert Lifestyles decided to intentionally delay the provision of this notice to Plaintiffs until September 1, 2015, specifically to avoid any litigation by Plaintiffs prior to the closing of the sale.

9.      Prior to September 1, 2015, Desert Lifestyles had ample opportunity to ensure that the Golf Course would be continuously watered during and after the change in possession of the Golf Course. Desert Lifestyles asked for and received copies of Par 72's water bills in advance of the closing of the sale. Desert Lifestyles received these bills with sufficient time to arrange for the water account attached to the Golf Course property to be transferred into its own name as of September 1. Alternatively, it had the ability to maintain the watering schedule put in place by Par 72 and to reimburse Par 72 for that use of water until such time as the water account could be transferred into its name.

10.     At all times prior to and after its purchase of the Golf Course, the intention of Desert Lifestyles was to close the Golf Course. Desert Lifestyles never intended to operate the Golf Course, as is required by the Golf Course Agreement.

11.     The Golf Course was fully operational when Defendants took possession of it from Par 72 on September 1, 2015 following the closing of the purchase. The tee boxes, fairways, and greens of the Golf Course were in satisfactory and playable condition, and the water features (lakes, ponds, etc.) on the Golf Course had not been drained. The irrigation system and maintenance equipment were in good working condition. Par 72 did not take any independent action to close the course, nor did it intend to close the course even if the sale to Desert Lifestyles had not gone through.

12.     At the time Defendants took possession of the Golf Course on September 1, 2015, the water and irrigation system for the Golf Course were turned on and the Golf Course was set

to be watered according to its normal watering schedule. Par 72 did not shut off the water service or irrigation system for the Golf Course at any time relevant to this action. The City of Las Vegas did not turn off the water service upon the change in ownership.

13.     After taking possession of the Golf Course on September 1, 2015, Defendants closed the Golf Course, erected a fence around the clubhouse, and took deliberate and purposeful action to cease all watering and maintenance of the Golf Course. Had Defendants not taken these actions, the irrigation system would have continued to operate and the Golf Course would have been continuously watered.

14.     Desert Lifestyles' deliberate action of ceasing all watering and maintenance to the Golf Course was done in bad faith and was an intentional attempt to lessen the likelihood that Desert Lifestyles would be required, as a result of any future litigation brought by Plaintiffs, to restore the Golf Course to the state it was in as of September 1, 2015.

15.     On September 8, 2015, the Homeowner Plaintiffs obtained a Temporary Restraining Order in Nevada state court ("State Court TRO") which ordered Defendants (1) not to remove the water pumps or otherwise commit or permit waste on the Golf Course Property, and (2) to turn on the water as necessary to flush the pipes, irrigate the grass and surrounding flora and fauna, and fill the water features of the Golf Course.

16.     Desert Lifestyles had actual knowledge of the State Court TRO as of September 8, 2015, and took no action to comply with it despite having the ability, expertise, and equipment to do so.

17.     As of September 8, 2015 (the date the State Court TRO was issued), the grass on the Golf Course was somewhat distressed from a week of not being watered, but was still capable of being completely restored to an optimal condition if Defendants had resumed watering it, as the State Court TRO ordered them to do.

18.     Desert Lifestyles intentionally took action to disable the irrigation systems and drain the water features of the Golf Course on or after September 1, 2015 in order to change the state of the Golf Course in anticipation of litigation by Plaintiffs. Moreover, after being notified of the State Court TRO on September 8, 2015, Desert Lifestyles intentionally refused to turn on

1    the water at the Golf Course in a further effort to allow the grass on the Golf Course to

2    deteriorate past the point at which it could be salvaged through normal watering and

3    maintenance.

4              19.     After removing this case to this Court on September 18, 2015, Defendants

5    represented to the Court that they purchased a nonoperational Golf Course on September 1,

6    2015. This representation was made in bad faith,[3] as the Course was fully operational and in

7    playable condition on September 1, 2015 and was being used by golfers the evening of August

8    31, 2015. To the extent that Par 72 began to cease operation of the Golf Course the morning of

9    September 1, 2015, this was done at the express direction of Desert Lifestyles in anticipation of

10   closing the sale that day. Par 72 did not take any action to close or cease operation of the Golf

11   Course that was not at the direction of Desert Lifestyles. While not in optimal condition on

12   September 8, 2015, the Golf Course was still in good condition and playable.

13             20.     After intentionally ordering Par 72 to begin closing the Golf Course on September

14   1, 2015 and themselves turning the irrigation system off after taking possession of the Golf

15   Course, Defendants later argued to this Court that they should not be forced to water a

16   nonoperational golf course. Defendants knew that the Golf Course was subject to a restrictive

17   covenant that required it to be continuously maintained and operated as a golf course.

18   Defendants nonetheless intentionally stopped the watering and maintenance of the Golf Course

19   despite knowing in advance of the purchase of the need to transfer the water account into their

20   own name and that the Las Vegas Valley Water District would supply all of their water needs.

21   Defendants then argued to this Court that the status quo of the Golf Course was that it was

22   nonoperational and was not being watered, and that Defendants should not be forced to do what

23   they were obligated to do under the Golf Course Agreement: establish a water account in their

24   own name and water and maintain the Golf Course.

25             21.     Defendants also argued to the Court that the water had been turned off and that

26   Desert Lifestyles had to place a deposit in order to turn the water on. This was a

27   _____

28        [3] All references to bad faith or misrepresentations in this Order are with respect to
     Defendants themselves, not counsel for Defendants.

misrepresentation. Desert Lifestyles had been previously informed that the water service would continue and the water service did continue. A deposit was not required to "turn the water on," because it was never turned off. Desert Lifestyles knew this at the time it made misrepresentations to this Court.

22.     As a result of Defendants' failure to water and maintain the landscaping of the Golf Course and failure to comply with the terms of the Golf Course Agreement and the State Court TRO, at least 70% of the grass on the Golf Course is either dead or dying, with no possibility of being restored through watering and other forms of maintenance such as weeding. The owners of homes on the Golf Course now have views of a course with dead and dying landscaping that is overgrown with weeds.

23.     Defendants' conduct has caused the Homeowner Plaintiffs to suffer significant impairment with respect to the use and enjoyment of their homes, particularly with respect to their views. Plaintiffs have also suffered significant decreases in the value of their homes that cannot be accurately quantified at this time for each homeowner. This decrease is more substantial with respect to those homeowners whose homes are located on the Golf Course.  The range of this decrease is approximately 20% to 30% of home value for homes on the Golf Course and 15% to 25% for homes not on the Golf Course. These homes will continue to decrease in value if the condition of the Golf Course remains the same as it is now or deteriorates.

24.     The owners of homes on the Golf Course paid a premium of approximately $200,000 for their homes to be on the Golf Course and with a view of the Golf Course. The Court finds that the value of the homes on the Golf Course have likely decreased by at least the value of the Golf Course premium.

25.     The cost of maintaining the Golf Course with regard to watering and other utilities and maintenance pursuant to the Golf Course Agreement is approximately $1 million per year.

26.     Desert Lifestyles does not have significant financial resources. It had to raise the approximately $340,000 it deposited to create a water account. It does not have operational or other funding that exceeds this amount. There is a very substantial risk that Desert Lifestyles will

1  become insolvent simply as a result of its limited financial resources and its increasing financial

2  obligations to maintain the Golf Course.

3      27.      Desert Lifestyles has no coherent or clear plan as to how it can or will restore the

4  lost home value and lost enjoyment of the use of these homes.

5      28.      Western Golf acts as the agent of Desert Lifestyles in the management and

6  maintenance of the Golf Course.

7

## III.      LEGAL STANDARD

9      Under federal law, a preliminary injunction is "an extraordinary remedy that may only be

10  awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res.

11  Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must

12  establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely

13  suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in

14  its favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. &

15  Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing

16  Winter, 555 U.S. 7, 20 (2008)). A preliminary injunction may issue under the "serious questions"

17  test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming

18  the continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain

19  a preliminary injunction by demonstrating "that serious questions going to the merits were raised

20  and the balance of hardships tips sharply in the plaintiff's favor," in addition to satisfying the

21  other Winter elements. Id. at 1134-35 (citation omitted).

22      Importantly, where (as here) the Court's jurisdiction is based on diversity of citizenship,

23  the Court must apply state law regarding the availability of preliminary injunctive relief rather

24  than federal law if the state law is outcome-determinative. Sims Snowboards, Inc. v. Kelly, 863

25  F.2d 643, 646-47 (9th Cir. 1988). This is because "a federal court adjudicating a State-created

26  right solely because of diversity of citizenship is for that purpose, in effect, only another court of

27  the State," and therefore cannot "substantially affect the enforcement of the right as given by the

28  State." Id. (quoting Guaranty Trust Co. v. York, 326 U.S. 99, 108-09 (1945)).

Nevada law is the applicable state law in this case. Plaintiffs seek a preliminary injunction based upon alleged breaches of the Golf Course Agreement, which provides that that agreement "shall be governed by, interpreted under, and construed in accordance with the laws of the State of Nevada." Pet. for Removal Ex. 2, § 13.17 ("Golf Course Agreement"). In Nevada,[4] parties have wide latitude in choosing the law governing their contracts "[s]o long as the parties acted in good faith and not to evade the law of the real situs of the contract[.]" Progressive Gulf Ins. Co. v. Faehnrich, 327 P.3d 1061, 1064 (Nev. 2014) (citation and internal quotation marks omitted). However, the state chosen by the agreement "must have a substantial relation with the transaction, and the agreement must not be contrary to the public policy of the forum . . . or other interested state." Id. (citation and internal quotation marks omitted). Here, the Court finds no evidence that the parties to the Golf Course Agreement did not act in good faith in choosing Nevada as the situs of their contract. The Court also finds that Nevada has a substantial relationship to the events at issue here. The Golf Course Agreement was created to govern the relationship between the owners of the residential property and the Golf Course, both of which are located in Nevada. Finally, the Golf Course Agreement is not contrary to the public policy of Nevada.

The Court therefore outlines the requirements for obtaining injunctive relief under Nevada law. In Nevada, "[a] preliminary injunction is proper where the moving party can demonstrate that it has a reasonable likelihood of success on the merits and that, absent a preliminary injunction, it will suffer irreparable harm for which compensatory damages would not suffice." Excellence Cmty. Mgmt., LLC v. Gilmore, 351 P.3d 720, 722 (Nev. 2015); see also N.R.S. 33.010. The decision whether to grant a preliminary injunction is within the discretion of the district court. Gilmore, 351 P.3d at 722.

## IV.  CONCLUSIONS OF LAW

The Court concludes that Plaintiffs have satisfied their burden of demonstrating that a

---

[4] The Court applies Nevada choice-of-law analysis in deciding which state's law to apply. See Atl. Marine Const. Co., Inc. v. U.S. Dist. Court, 134 S.Ct. 568, 582 (2013) ("A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits.").

1  preliminary injunction is warranted in this case to maintain the status quo, which is the state of

2  the Golf Course as it would have been in given continuous watering and maintenance as of

3  September 1, 2015.

4          First, as discussed below, the Court finds that a preliminary injunction should be issued

5  under either federal or state law.  While it would appear that state law would predominate this

6  analysis under the Erie doctrine,[5] the Court finds that it need not decide which law has priority

7  here as the issuance of an injunction in this case is supported by both state and federal law. The

8  Court elaborates below its analysis under both state and federal law, particularly in light of the

9  tension in the case law acknowledged by the Ninth Circuit in Sims Snowboarding regarding the

10 demarcation between state and federal law in preliminary injunctions. 863 F.2d at 647

11 (recognizing that federal courts examining the applicability of preliminary injunctions in

12 diversity cases "have come to contradictory conclusions," and citing cases).

13         The relevant provisions of the Golf Course Agreement are central to the Court's

14 determination as to whether to issue a preliminary injunction in this case. Therefore, before

15 turning to its application of the preliminary injunction standards, the Court finds it useful to set

16 forth those relevant sections in some detail.

17     **A. Relevant Provisions**

18         The Golf Course Agreement was entered into and recorded on June 14, 2002 by Pulte

19 Homes (as Residential Property Owner) and Meadowbrook Mountain Spa, LLC (as Golf Course

20 Owner). The Agreement defines the "Golf Course Owner" as Meadowbrook or any future person

21 or entity who holds beneficial or equitable fee simple title to any portion of the Golf Course.

22 Golf Course Agreement § 1.18. "Residential Property Owner" is defined under the Agreement as

23

24         [5] Following the U.S. Supreme Court's decision in Erie R.R. Co. v. Tompkins, 304 U.S.
   64 (1938), and subsequent cases, "federal courts sitting in diversity apply state substantive law
25 and federal procedural law." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996).
   "Classification of a law as 'substantive' or procedural' for Erie purposes is sometimes a
26 challenging endeavor." Id. Generally, a law is classified as substantive if its application would be
   "outcome-determinative," that is, if disregarding the law would "significantly affect the result of
27 a litigation." Id. (quoting Guaranty Trust, 326 U.S. at 109). However, this test "must not be
   applied mechanically to sweep in all manner of variations; instead, its application must be guided
28 by the twin aims of the Erie rule: discouragement of forum-shopping and avoidance of
   inequitable administration of the laws." Id. at 428 (quoting Hanna v. Plumer, 380 U.S. 460, 468
   (1965)).

Pulte Homes "and any Person to whom [Pulte Homes] (or any of its successors and assigns) has assigned all or any portion of the Residential Property Owner's rights or obligations hereunder pursuant to a written instrument recorded in the official records of [Clark County, Nevada]." Id. § 1.35.  The Agreement details the rights, obligations, and enforcement rights of the Golf Course Owner and Residential Property Owner with respect to the Golf Course.

### *1. Golf Course Standards*

Section 3.1 of the Agreement sets forth the basic obligations of the Golf Course Owner:

> The Golf Course Owner hereby covenants and agrees that the Golf Course Property **shall be operated and maintained solely as a 27-hole (or more) championship golf course** and related improvements, which shall generally be open to the public. The Golf Course Owner shall maintain the property in a clean, safe, attractive and reasonably weed-free condition. The Golf Course Owner further acknowledges and agrees that Residential Property Owner has acquired and will develop the Residential Property in reliance upon Golf Course Owner's covenants in this Section 3.1. Subject to Sections 13.2 and 13.3 [of the Agreement], the restrictions set forth in this Section 3.1 shall continue in perpetuity.

(emphasis added). The Agreement also contains specific provisions for the maintenance of the Golf Course:

> Golf Course Owner shall (at Golf Course Owner's sole cost and expense) (i) refrain from committing waste on the Golf Course Owner Property, and (ii) maintain, preserve, and keep the Golf Course Property and Golf Course Facilities in accordance with the Golf Course Standards, and (iii) make all necessary interior and exterior repairs to the clubhouse and other Golf Course Facilities . . . .

Id. § 3.3.1. The Agreement defines "Golf Course Facilities" as follows:

> "Golf Course Facilities" shall mean a 27-hole (or more), championship golf course and driving range, practice greens, a clubhouse and all infrastructure, landscaping, service areas, bridges, tunnels, cart paths, roadways, utilities, drainage channels, retention facilities, culverts, spillways, irrigation systems, water, water features, reservoirs, ponds, golf course tees, traps, fairways, greens, bunkers and any other features, restaurant, bar and properties, structures and facilities of any kind located or to be located on the Golf Course Property.

Id. § 1.17. The "Golf Course Standards" that the course owner must follow are defined as "a standard consistent with a typical first-class, 27-hole, championship golf course, and consistent

with the standards as set forth in Exhibit C hereto." Id. § 1.20. Exhibit C, which states that it contains "the minimal guidelines to perform maintenance at Mountain Spa," sets forth detailed standards as appropriate for the mowing, aerification, spiking, topdressing, fertilization, and overseeding of the greens, tees, and fairways. See generally Golf Course Agreement Ex. C, ECF No. 1-5. Exhibit C also provides standards for the maintenance of bunkers, trees, pests, the irrigation system, and other aspects of the landscaping of the Golf Course. Id. The Golf Course Standards also include the requirement that "[a]ll water features shall be kept in clean operating condition, free of debris and algae, and all irrigation systems shall be fully operational at all times or, if in disrepair, repaired as promptly as possible." Id. § 1.20.

### 2. *Arbitration of Disputes and Enforcement*

The Golf Course Agreement also has several provisions relating to resolution of disputes and enforcement. Section 10.3 of the Agreement contains an arbitration clause. It states that "all claims, disputes and matters in question arising out of, or relating to this Agreement or the breach thereof [aside from those matters expressly excluded] shall be decided by arbitration . . . unless the parties mutually agree otherwise; provided, however, that a party may seek prohibitory injunctive relief without first submitting the controversy to arbitration." Id. § 10.3.

Article 13 of the Agreement contains an enforcement provision: "Residential Property Owner (so long as it owns any portion of the Residential Property), the Association[6] and Golf Course Owner shall have the right to enforce this Agreement in any manner, by proceeding at law or in equity, including, but not limited to, an action to obtain an injunction to compel compliance with this Agreement." Id. § 13.1.

### 3. *Amendment and Termination of Agreement*

Sections 13.2 and 13.3 of the Golf Course Agreement govern termination and amendment of the Agreement. The Agreement provides that it shall continue in full force and effect until properly terminated, which may be done with the approval of the Golf Course Owner, Residential Property Owner (if it owns any of the property at that time), and 75% of the homeowners. Id. § 13.2.1, 13.2.2.

---

[6] Section 1.3 of the Agreement defines "Association" as the Silverstone HOA.

With respect to amendments, the Agreement states as follows:

> This Agreement may be amended only with the written approval or the affirmative vote, or any combination thereof, of (i) the Unit Owners (including, without limitation, Residential Property Owner) owning not less than seventy-five percent (75%) of the Units within the Residential Property which have been annexed pursuant to the terms of the [CC&Rs], (ii) the Residential Owner (for so long as the Residential Owner owns any portion of the Residential Property, and thereafter the Association), and (iii) the Golf Course Owner.

Id. § 13.3.1.

### B.  Preliminary Injunction Under Nevada Law

The Court now turns to whether a preliminary injunction should issue under Nevada law. As discussed above, in order to obtain preliminary injunctive relief in Nevada, the plaintiff must show a "reasonable likelihood of success on the merits" and that it would suffer irreparable harm absent an injunction. Gilmore, 351 P.3d at 722. Courts may also weigh the relative hardship to the parties and whether an injunction would serve the public interest. Clark Cnty. Sch. Dist. v. Buchanan, 924 P.2d 716, 719 (Nev. 1996).

### 1.  Likelihood of Success on the Merits

Under Nevada law, "[r]estrictive covenants are strictly construed and enforceable, if the original purpose for the covenant continues to result in a substantial benefit to the restricted subdivision. Words in a restrictive covenant, like those in a contract, are construed according to their plain and popular meaning." Diaz v. Ferne, 84 P.3d 664, 666 (Nev. 2004) (alteration in original) (citations and internal quotation marks omitted).

The Court finds that the Golf Course is the subject of a restrictive covenant as expressed in the Golf Course Agreement, which states that the Golf Course Owner "covenants and agrees that the Golf Course Property shall be operated and maintained solely as a 27-hole (or more) championship golf course and related improvements, which shall generally be open to the public." Golf Course Agreement § 3.1. Desert Lifestyles, as the undisputed holder of equitable and legal title to the Golf Course, is the Golf Course Owner as defined by the Agreement. Desert Lifestyles is thus bound by the plain terms of the agreement to operate and maintain the Golf Course property *solely* as a 27-hole golf course. At the preliminary injunction hearing, the Court

heard testimony that the Golf Course continues to benefit the homeowners of the Silverstone Ranch Community. The Court has also found that Desert Lifestyles is not currently operating or maintaining the Golf Course as a 27-hole championship golf course as required by the Golf Course Agreement. Indeed, Desert Lifestyles does not dispute that it has not maintained or operated the property as 27-hole championship golf course. Therefore, Plaintiffs have established a high likelihood of success on the merits of their claim for breach of the Golf Course Agreement.

In their brief, Defendants rely on the defenses of impossibility and frustration of purpose to argue that performance under the Golf Course Agreement should be excused. Neither defense is applicable here. First, under the doctrine of impossibility, "performance would be excused if the promisor's performance is made impossible or highly impractical by the occurrence of unforeseen contingencies, but if the unforeseen contingency is one which the promisor should have foreseen, and for which he should have provided, this defense is unavailable to him." Helms Constr. & Dev. Co. v. State ex rel. Dept. of Highways, 634 P.2d 1224, 1225 (Nev. 1981) (citations and internal quotation marks omitted). Defendants have not presented any evidence that maintenance or operation of the Golf Course would be impossible or highly impractical due to unforeseen circumstances. Although Defendants presented testimony that the golf industry in Las Vegas is suffering due to the economic downturn, a struggling economy alone cannot serve as the basis for this defense. If that were the case, any promisor who was losing money under a contract would be able to avoid her obligations under that contract simply by pointing to indicators of poor economic performance—clearly an untenable result. In addition, the Court heard testimony at the hearing that other golf courses in Las Vegas are profitable and that the Silverstone Golf Course could be made profitable. Moreover, Desert Lifestyles was aware of the financial risk associated with operating and maintaining a golf course and was aware of the restrictive covenant requiring the Silverstone Golf Course to be maintained and operated as such. These were not unforeseen contingencies. Thus, the impossibility defense does not apply to this case.[7]

---

[7] Defendants also argued in their initial opposition brief that they should be excused from

Second, Defendants' reliance on the commercial frustration defense is similarly misplaced. "The doctrine of commercial frustration applies to discharge a party's contractual obligation when [p]erformance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration." Graham v. Kim, 899 P.2d 1122, 1124 (Nev. 1995) (alteration in original) (citation and internal quotation marks omitted). In Graham, the Supreme Court of Nevada declined to apply the defense of frustration of purpose to a real estate transaction where the subject property was destroyed in a fire, because the buyers' purchase of fire insurance demonstrated that they foresaw the possibility of this occurrence. Id. Here, Defendants cannot rely on the frustration defense because all of the evidence currently before the Court indicates that they bought the Golf Course fully expecting and intending to close it down and cease all operation and maintenance of it. Therefore, Defendants cannot say that their "expected value of performance" of the Golf Course Agreement was frustrated, because they simply never intended to abide by the Golf Course Agreement at all. Moreover, even if Defendants could be entitled to rely on the expected value of performance of the Golf Course Agreement, mere unprofitability of a business venture is well within the realm of foreseeable consequences in this case and therefore cannot serve as the basis for the defense of frustration of purpose. See Waegemann v. Montgomery Ward & Co., Inc., 713 F.2d 452, 454 (9th Cir. 1983) (applying California law) ("The doctrine of frustration is inapplicable when an unforeseeable event merely makes performance more expensive or less profitable than anticipated.").

Defendants' argument that Plaintiffs lack standing to enforce the Golf Course Agreement is also unavailing. The Silverstone HOA and the Homeowners have each been given authority to enforce the Agreement. The Silverstone HOA is expressly given this authority under Section 13.1 of the Agreement. See Golf Course Agreement § 13.1 (giving "the Association" the right to enforce the Agreement "in any manner, by proceeding at law or in equity, including, but not limited to, an action to obtain an injunction to compel compliance with this Agreement"); id.

---

performance due to drought conditions in Nevada. While Defendants presented some support in their briefing for the fact that drought conditions exist, they provided no evidence of any water restrictions or increased costs due to the drought or any associated water shortage.

1  § 1.3 (defining "Association" as "the Silverstone Ranch Community Association formed or to be

2  formed").

3       The Homeowners also have authority, derivative of Pulte Homes (the developer of

4  Silverstone), to enforce the Agreement. In addition to giving enforcement authority to the

5  Silverstone HOA, Section 13.1 of the Agreement also grants such authority to the Residential

6  Property Owner. The Residential Property Owner is defined as Pulte Homes, "and any Person to

7  whom [Pulte Homes] (or any of its successors and assigns) has assigned all or any portion of the

8  Residential Property Owner's rights or obligations hereunder pursuant to a written instrument

9  recorded in the official records of the County." Id. § 1.35. Pulte Homes assigned its rights under

10  the Golf Course Agreement to the Homeowners in the CC&Rs, which neither party disputes

11  were publicly recorded at the same time as the Golf Course Agreement. Decl. of Steve

12  Hellerstein Ex. 1 § 11.1, Pet. for Removal Ex. B, ECF No. 1 ("CC&Rs") ("The Association, *or*

13  *any Unit's Owner*, shall have the right to enforce, by any proceeding at law or in equity, all

14  restrictions, conditions, [and] covenants . . . now or hereafter imposed by the provisions of the

15  Governing Documents.") (emphasis added); id. § 1.2.28 (defining "Governing Documents" to

16  include the Golf Course Agreement).[8] Thus, both the Homeowners and the Silverstone HOA

17  have standing to enforce the Golf Course Agreement against Defendants.

18       The Court also concludes that the Silverstone HOA has validly intervened in this action.

19  In an Order from Nevada state court dated September 11, 2015, the Silverstone HOA was

20  permitted to intervene in this case and file its Complaint-in-Intervention. Further, the Court finds

21  that the Silverstone HOA would have also been permitted to intervene in this action under the

22

23       [8] Defendants argue that Section 13.16 of the Golf Course Agreement expressly precludes
24  any individual homeowner from enforcing the Agreement. However, that section begins with the
    clause "Except as expressly provided herein . . . ." Because the Agreement contains an express
25  provision—Section 1.35—that allows Pulte Homes to assign its rights under the Agreement
    (which it did in the CC&Rs), the Court finds this argument unpersuasive.

26       Similarly, the Court is not persuaded that the Homeowners lack standing to enforce the
    Golf Course Agreement because of the language in the enforcement section that states that "[i]n
27  no event may any individual Unit Owner enforce this Agreement." Id. § 13.1. While that clause
    prevented Silverstone homeowners from claiming direct authority to enforce the Agreement at its
28  signing and before the assignment of rights by Pulte Homes, it does not now preclude them from
    doing so through an assignment by Pulte Homes as Residential Property Owner.

1    Federal Rules of Civil Procedure, as its Complaint-in-Intervention and its ability to enforce the

2    Golf Course Agreement demonstrate that its claims share common questions of law and fact with

3    the Homeowner Plaintiffs' claims. See Fed. R. Civ. P. 24(b)(1) ("On timely motion, the court

4    may permit anyone to intervene who . . . (B) has a claim or defense that shares with the main

5    action a common question of law or fact.").

6                            *2.   Irreparable Harm*

7           In Nevada, Plaintiffs do not need to prove actual damages resulting from the breach of a

8    restrictive covenant. "Generally, restrictive covenants may be enforced irrespective of the

9    amount of damages which will result from a breach. Actual damages need not be shown."

10   Gladstone v. Gregory, 596 P.2d 491, 495 (Nev. 1979). It therefore appears that the Supreme

11   Court of Nevada would not require a showing of irreparable harm where a plaintiff seeks

12   enforcement of a restrictive covenant, as is demonstrated by a recent unpublished decision from

13   that Court. See Nobis v. So. Highlands Dev. Corp., 238 P.3d 842, at *2 (Nev. 2008) ("In the case

14   of restrictive covenants . . . irreparable harm is not required.").

15          Nevertheless, even if Nevada law were to require a showing of irreparable harm in this

16   case, Plaintiffs have made that showing here on two independent grounds. First, Plaintiffs have

17   established that they have suffered, and are likely to continue to suffer, irreparable harm with

18   respect to the views from their homes and the enjoyment of the use of their homes related to

19   these views. Nevada law provides that "[a] view is a unique asset for which a monetary value is

20   very difficult to determine." Leonard v. Stoebling, 728 P.2d 1358, 1363 (Nev. 1986) (quoting

21   Glover v. Santangelo, 690 P.2d 1083, 1086 (Or. Ct. App. 1984)). In Leonard, the Supreme Court

22   of Nevada issued a mandatory injunction to restore the appellant homeowners' view when the

23   appellee engaged in construction that blocked that view despite the existence of a restrictive

24   covenant prohibiting such activity. Here, the Court has found that Defendants' failure to comply

25   with the Golf Course Agreement and the State Court TRO has significantly impaired the

26   Homeowner Plaintiffs' views from their homes, particularly those homeowners whose homes are

27   located on the Golf Course. Plaintiffs have therefore established a likelihood of irreparable harm

28   in the form of obstructed and impaired views absent the issuance of an injunction.

- 17 -

Second, Plaintiffs have suffered irreparable harm from the physical damage to the Golf Course itself as a result of Defendants' intentional act of not watering or maintaining the course since September 1, 2015. Under Nevada law, "[a]ny act which destroys or results in a substantial change in property, either physically or in the character in which it has been held or enjoyed, does irreparable injury which justifies injunctive relief." Memory Gardens of Las Vegas, Inc. v. Pet Ponderosa Memorial Gardens, Inc., 492 P.2d 123, 125 (Nev. 1972). Here, Defendants' actions rendered the grass on the Golf Course largely dead or dying, and incapable of restoration simply by watering and other routine maintenance. Defendants have committed acts—and unless enjoined are likely to continue committing acts—that have caused substantial physical change to the Golf Course and have destroyed the property's character as a golf course. Plaintiffs purchased their homes in reliance upon the fact that the owner of the Golf Course would maintain and operate it as a golf course, as required by the Golf Course Agreement (which Plaintiffs have the authority to enforce). These changes to the Golf Course have thus substantially impaired Plaintiffs' use and enjoyment of their homes and caused an associated drop in the values of Plaintiffs' homes, neither of which are quantifiable.

### 3. Relative Hardship

Although it is not required, courts applying Nevada law may weigh the relative hardships to the parties in deciding whether to issue a preliminary injunction. Buchanan, 924 P.2d at 719. Under Nevada law, however, "[t]he equitable principle of relative hardship is available only to innocent parties who proceed without knowledge or warning that they are acting contrary to others' vested property rights." Gladstone, 596 P.2d at 480. Desert Lifestyles was clearly not an innocent party in this case. As found by the Court, Desert Lifestyles was provided copies of the Golf Course Agreement and the CC&Rs as early as July 2015, and knew prior to taking ownership of the Golf Course that the property was under a restrictive covenant that required its owner to maintain and operate it as a golf course. Defendants therefore assumed the risk that by directing Par 72 to close the course, shutting off the irrigation system, and disregarding the State Court TRO, they would incur greater hardship in the future.

Based on these factors, the Court concludes that a preliminary injunction should issue

1    under Nevada law. The Court next turns to the federal standard for obtaining preliminary

2    injunctive relief.

3    **C. Preliminary Injunction Under Federal Law**

4    To obtain a preliminary injunction under federal law, as referenced above, a plaintiff

5    "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

6    harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

7    injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20.

8    *1. Likelihood of Success on the Merits*

9    As discussed above, Plaintiffs have demonstrated a high likelihood of success on the

10   merits of their claim for declaratory and injunctive relief based upon a breach of the Golf Course

11   Agreement. Therefore, this element is satisfied. <u>See</u> Section IV.B.1, <u>supra</u>.

12   *2. Likelihood of Irreparable Harm*

13   Under the second <u>Winter</u> factor, a plaintiff seeking a preliminary injunction must

14   establish a likelihood—not just a possibility—of irreparable harm. <u>Winter</u>, 555 U.S. at 22. Where

15   (as here) a right of action arises under state law, the extent to which damages are an available

16   remedy is also governed by state law. <u>See</u> <u>Clausen v. M/V New Carissa</u>, 339 F.3d 1049, 1064-65

17   (9th Cir. 2003) (finding a right to damages accruing to prevailing plaintiffs under a state statute

18   to be substantive, because "the question of the proper measure of damages is inseparably

19   connected with the right of action") (internal quotation marks omitted); <u>see also</u> <u>Eagle Investors</u>

20   <u>v. Bank of America</u>, 585 F. App'x 742, 742 (9th Cir. 2014) (holding, in an unpublished and non-

21   precedential decision, that the district court erred in finding no showing of a likelihood of

22   irreparable harm and that "[w]here, as here, a right of action arises under state law, state law

23   must also govern the extent to which damages are available to vindicate that right.").

24   Applying state law to this element, the Court concludes that Plaintiffs have established a

25   likelihood of irreparable harm. As discussed above, the evidence presented at the preliminary

26   injunction hearing demonstrates that Plaintiffs have suffered, and are likely to continue to suffer,

27   harm that cannot be adequately compensated through monetary damages under Nevada law. <u>See</u>

28   Section IV.B.2, <u>supra</u>.

However, even if the Court were to apply the federal standard to this element, Plaintiffs have established a likelihood of irreparable harm. First, under federal law, Defendants' failure to water or maintain the Golf Course, which significantly altered the character of the Golf Course and impaired the use and enjoyment of Plaintiffs' land and their views, constitutes irreparable injury. See Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable."). In this case, the Court finds, based upon the record, that the damage to the Golf Course landscaping will require at least five to six months to remedy even with the most drastic intervention taken.

Second, the risk that Desert Lifestyles will not be able to satisfy an eventual award of monetary damages justifies a finding that irreparable harm is likely absent an injunction. See Johnson v. Couturier, 572 F.3d 1067, 1081 (9th Cir. 2009) (holding that the district court did not abuse its discretion in finding the irreparable harm prong satisfied where the plaintiffs showed that it was likely that the defendants would not have the resources to satisfy a judgment in the plaintiffs' favor); Deckert v. Independence Shares Corp., 311 U.S. 282, 290 (1940) ("[T]here were allegations that Independence was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against Independence . . . would be inadequate."). Here, Desert Lifestyles represented to this Court multiple times that it did not have the operational funds to pay the $342,000 deposit to the water authority to place the water account for the Golf Course in its name. The Court has found that the Desert Lifestyles will likely become insolvent simply from the cost of maintaining the golf course for a year—a cost of approximately $1 million. Although the loss resulting from Desert Lifestyles's conduct cannot be precisely determined for each home, the Court finds based upon the record thus far that it would likely be in the range of $10 million to $15 million for the entire community. Therefore, the significant risk that Desert Lifestyles would not be able to satisfy a judgment for damages serves as an additional basis for finding that irreparable harm is likely without an injunction.

### 3. Balance of Equities

The Court concludes that Plaintiffs have established that the balance of equities tip in

their favor. The harm that would result to Plaintiffs if an injunction were not issued—namely, the continued impairment of their views, which are unique assets, and substantial alteration in the character of the Golf Course itself, which significantly impairs the use and enjoyment of Plaintiffs' homes and violates the Golf Course Agreement that Plaintiffs are authorized to enforce—outweighs the harm to Desert Lifestyles from compliance.

The Court acknowledges that by being required to comply with an injunction, Desert Lifestyles will incur significant financial costs. However, it is appropriate for Desert Lifestyles to bear these costs under the circumstances. The Court has found that, when it purchased the Golf Course on September 1, 2015, Desert Lifestyles had notice of the restrictive covenant in effect on the course requiring that it be maintained and operated as a 27-hole championship golf course. Desert Lifestyles also had copies of Par 72's water bills, and therefore was on notice of the significant costs involved in watering and maintaining the Golf Course. Thus, insofar as the preliminary injunction issued in this Order imposes a financial hardship on Desert Lifestyles, this is a burden that Desert Lifestyles clearly knew it would likely have to bear when it agreed to purchase the Golf Course. Further, to the extent this preliminary injunction imposes additional costs on Desert Lifestyles to reinstate the status quo as of September 1, 2015, these costs were greatly exacerbated by its own conduct. Desert Lifestyles decided in bad faith not to notify Plaintiffs of the impending sale of the Golf Course, and upon purchasing the Golf Course willfully disregarded the Golf Course Agreement and State Court TRO by turning off the water and irrigation systems. The irreparable harm to Plaintiffs therefore outweighs the monetary, and partially self-induced, harm to Desert Lifestyles.[9]

### 4. Public Interest

Finally, Plaintiffs have established that the public interest favors an injunction. The Court finds that it is clearly in the public interest to enforce restrictive covenants such as the Golf

---

[9] The Court recognizes that it is not settled whether state law applies to the balancing of equities analysis. Nevertheless, to the extent state law is applicable, the conclusion that the equities weigh in favor of Plaintiffs is bolstered by the Court's finding, discussed above, that Desert Lifestyles was not an innocent party and therefore is not entitled to consideration under Nevada's equitable principle of relative hardship. See Section IV.B.3, supra; Gladstone, 596 P.2d at 480.

1  Course Agreement. Silverstone Ranch Community has over 1,500 homes, and each of those
2  homeowners relied on the continued enforcement of the Golf Course Agreement and is in turn
3  expected to abide by certain covenants and restrictions. In addition, Las Vegas is home to many
4  planned communities such as Silverstone in which homeowners associations are tasked with
5  enforcing restrictive covenants. The enforcement of the Golf Course Agreement, upon which a
6  large number of homeowners relied in purchasing their property, is clearly in the public interest.

7      The Court therefore concludes that Plaintiffs have established each of the four <u>Winter</u>
8  factors and are entitled to a preliminary injunction under the federal standard as well.

9      **D. Status Quo**

10     "A preliminary injunction can take two forms. A prohibitory injunction prohibits a party
11  from taking action and preserve[s] the status quo pending a determination of the action on the
12  merits. A mandatory injunction orders a responsible party to take action." <u>Marlyn Nutraceuticals,</u>
13  <u>Inc. v. Mucos Pharma GmbH & Co.</u>, 571 F.3d 873, 878-79 (9th Cir. 2009). A mandatory
14  injunction "goes well beyond maintaining the status quo *pendente lite* [and] is particularly
15  disfavored. The district court should deny such relief unless the facts and law clearly favor the
16  moving party." <u>Garcia v. Google, Inc.</u>, 786 F.3d 733, 740 (9th Cir. 2015) (alteration in original)
17  (citation and internal quotation marks omitted). "The status quo means the last, uncontested
18  status which preceded the pending controversy." <u>N.D. ex rel. Parents v. Haw. Dep't of Educ.</u>,
19  600 F.3d 1104, 1112 n.6 (9th Cir. 2010) (citation and internal quotation marks omitted).

20     Here, the Court finds that the last uncontested status of the Golf Course as between
21  Plaintiffs and Defendants was September 1, 2015, the date on which Desert Lifestyles closed
22  their purchase of the Golf Course. On this date, the Golf Course was being consistently watered
23  and maintained, and the irrigation system was set to continue watering the course. Desert
24  Lifestyles had the necessary equipment to maintain the course and the irrigation system would
25  have watered the course absent any action by Desert Lifestyles. However, after taking possession
26  of the Golf Course, Desert Lifestyles promptly turned off the irrigation system and ceased
27  maintenance of the Golf Course, despite knowing that the Silverstone HOA and homeowners
28  would oppose such action. The fact that Desert Lifestyles knew on September 1, 2015 that the

1    homeowners and HOA would contest its actions is shown in two ways.

2         First, at least ten days prior to completing its purchase of the Golf Course, Desert

3    Lifestyles knew of the existence of ongoing litigation by the HOA against Par 72. In this

4    litigation, the HOA sought injunctive relief against Par 72 for its alleged failure to maintain the

5    Golf Course according to the standards in the Golf Course Agreement and its alleged

6    commission of waste on the Golf Course. This was litigation into which Desert Lifestyles could

7    (and did) reasonably expect to have been drawn after the closing of the sale as successor-in-

8    interest to Par 72. This litigation served to notify Desert Lifestyles that the homeowners would

9    likely oppose any efforts by Desert Lifestyles to alter the Golf Course in contravention of the

10   Golf Course Agreement.

11        Second, at least as early as August 21, 2015, Desert Lifestyles—aware of the likelihood

12   that Plaintiffs would pursue legal action against it—deliberately chose to delay notification to the

13   homeowners of the impending sale of the Golf Course until after it had been completed. Despite

14   the fact that as of August 21, 2015, Par 72 had already prepared a letter to the homeowners

15   notifying them of the sale and Desert Lifestyles' intention to close the Golf Course, Desert

16   Lifestyles specifically requested that this notification not be sent until September 1, 2015. In its

17   direction to Par 72 to delay notification, Desert Lifestyles expressly acknowledged that it was

18   doing so to avert litigation prior to the closing of the sale. Desert Lifestyles also specifically

19   requested that Par 72 provide it with enough equipment to maintain the Golf Course, which,

20   combined with its clear intention to close the course, constitutes further evidence that Desert

21   Lifestyles knew that it nevertheless might be compelled to take some action to maintain the

22   course.

23        Given this evidence, the Court finds that the date of the last uncontested status of the Golf

24   Course is September 1, 2015. Defendants' argument to the contrary is without merit, as the status

25   quo date does not necessarily refer to the date a lawsuit was filed. To set the status quo date at

26   any time after September 1, 2015 would be particularly inappropriate here, as the evidence

27   demonstrates that Desert Lifestyles deliberately delayed notice to homeowners and ceased

28   watering and maintenance of the Golf Course in an effort to manipulate the status quo before

1   Plaintiffs could take legal action. See GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1210

2   (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a

3   lawsuit, but instead to the last uncontested status which preceded the pending controversy . . . . In

4   this case, the status quo ante litem existed before [the defendant] began using its allegedly

5   infringing logo. The interpretation of this concept that [the defendant] advocates would lead to

6   absurd situations, in which plaintiffs could never bring suit once infringing conduct had

7   begun.").

8        Moreover, the fact that Desert Lifestyles took action despite knowing of the covenant

9   contained in the Golf Course Agreement and the likelihood of litigation against it to stop that

10  action—either by being brought into the Par 72 litigation or by Plaintiffs directly bringing a

11  separate suit, as they did—provides an independent basis for finding that the status quo date is

12  September 1, 2015. "[A]fter a defendant has been notified of the pendency of a suit seeking an

13  injunction against him, even though a temporary injunction be not granted, he acts at his peril

14  and subject to the power of the court to restore the status, wholly irrespective of the merits as

15  they may be ultimately decided." Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172,

16  1187 (9th Cir. 2000) (quoting Nat'l Forest Preservation Grp. v. Butz, 485 F.2d 408, 411 (9th Cir.

17  1973)). By turning off the irrigation system and ceasing to maintain the Golf Course, Defendants

18  chose to ignore the obvious and known risks of litigation by the Silverstone HOA and the

19  Homeowners. Defendants thus acted at their peril, and this Court may order the restoration of the

20  Golf Course to the state it was in as of September 1, 2015—the date Desert Lifestyles took action

21  despite notice of the strong likelihood of litigation seeking injunctive relief to stop that action.

22        Finally, the Court finds that even if the status quo were set to September 8, 2015, the date

23  that Desert Lifestyles received actual notice of the State Court TRO, this would not impact the

24  performance required under the injunction being issued by this Court. This is because the Court

25  has found that as of September 8, 2015, the landscaping on the Golf Course and the course itself,

26  while distressed, was still in good and playable condition. As the Court has found, if Desert

27  Lifestyles had begun watering and maintaining the Golf Course even on September 8, the course

28  would have been completely restored to its optimal condition.

### E.  Prohibitory vs. Mandatory Injunction

The arbitration provision in the Golf Course Agreement requires that all disputes between the parties relating to the Agreement or its breach must be decided by arbitration, "provided, however, that a party may seek prohibitory injunctive relief without first submitting the controversy to arbitration." Golf Course Agreement § 10.3. Defendants contend that an order that they water, maintain, or operate the Golf Course would constitute a mandatory injunction.

Given that the status quo is the state of the Golf Course as it existed when Defendants took possession on September 1, 2015, the Court finds that the injunction to be ordered— namely, that Desert Lifestyles restore the Golf Course to the condition it would have been in had it received continuous watering and maintenance as of September 1, 2015, and to maintain the Golf Course in that condition—is prohibitory, not mandatory. This injunction "preserve[s] the status quo pending a determination of the action on the merits." Marlyn Nutraceuticals, 571 F.3d at 878. Desert Lifestyles will be required to preserve the state of the Golf Course at the time it took possession of it on September 1, 2015, at which time the course was being watered and maintained, the maintenance equipment had been transferred to Desert Lifestyles, and Desert Lifestyles knew that the Golf Course Agreement required it to maintain and operate the property as a golf course.

The Court is not persuaded by the argument that its order constitutes a mandatory injunction. The Court is requiring Desert Lifestyles to maintain the last uncontested status of the Golf Course, which is the state it was in as of September 1, 2015. This is unlike previous cases in which the Ninth Circuit has found injunctions to be mandatory. See, e.g., Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust, 636 F.3d 1150, 1160 (9th Cir. 2011) (mandatory injunction requiring defendant to enter into contracts with the city housing authority to become eligible for an enhanced voucher program); Stanley v. Univ. of S. Calif., 13 F.3d 1313, 1320 (9th Cir. 1994) (mandatory injunction ordering defendant university to install plaintiff as the head coach of the women's basketball team and raise her pay, where plaintiff's previous employment contract with the university had expired over a month before initiation of the lawsuit); Anderson v. United States, 612 F.2d 1112, 1113-15 (9th Cir. 1979) (mandatory injunction ordering the

U.S. Air Force, pending a decision on the merits, to transfer plaintiff into a specific position of employment for which she had applied and been rejected, despite having been given priority consideration). The injunctions issued in those cases ordered relief that required the defendants to take actions above and beyond the preexisting state of affairs. Here, by contrast, the Golf Course was being watered and maintained when Desert Lifestyles took ownership and possession of it. This was the state of affairs that existed immediately prior to the pending controversy. The fact that Desert Lifestyles stopped watering and maintaining the Golf Course prior to the initiation of the lawsuit was only made possible by Defendants' bad-faith decision to delay notification to Plaintiffs until the day the sale was completed. There is no doubt that had Plaintiffs been notified of Desert Lifestyles's intentions prior to September 1, 2015, they would have immediately opposed any such action. Therefore, this Order merely requires Desert Lifestyles to restore and maintain the course as it existed when they acquired it. It does not order Desert Lifestyles to exceed this status quo.[10]

## F.  Operation of the Golf Course

In their motion, the Silverstone HOA requests that the Court order Desert Lifestyles not only to water and maintain the Golf Course, but also to reopen it and operate it as a golf course. While this is undoubtedly required by the express language of the Golf Course Agreement, the Court declines to order that Desert Lifestyles *operate* the Golf Course as a business.

As stated above, mandatory injunctions are especially disfavored. Garcia, 786 F.3d at 740. Although the bad faith conduct of Desert Lifestyles, with notice of the likely pendency of

---

[10]  Moreover, even if this Order were construed as a mandatory injunction, such an injunction might not be precluded by the arbitration clause in the Golf Course Agreement. Based upon the Court's preliminary review of the Agreement, the requirement to arbitrate may only apply to parties to the Agreement. See Golf Course Agreement § 10.3.7 ("No arbitration arising under the terms of this Agreement will include, by consolidation, joinder or in any other manner, any additional person not a party to this Agreement, except for any other Person who has agreed to arbitrate . . . but only upon the prior written consent of both parties hereto."). The Silverstone HOA is not a signatory to the Agreement, is not identified as a party, and the Court has not been provided with any evidence that it consented to arbitrate disputes under the Agreement. Therefore, given that it has authority to seek an injunction to compel compliance with the Agreement under Section 13.1, the Silverstone HOA could be entitled to pursue a mandatory injunction. While the Court is not deciding at this point whether or not the HOA could seek a mandatory injunction or is bound by the arbitration clause, if the HOA could seek a mandatory injunction, the Court would find such an injunction supported by the facts of this case.

litigation, justifies injunctive relief to maintain the Golf Course, the Court does not find that ordering Desert Lifestyles to operate the course as a business during the pendency of this action would be similarly justified. Such an order is tantamount to ordering specific performance of the Golf Course Agreement. Both federal and Nevada case law express a clear and longstanding aversion to ordering specific performance where it would involve extensive, detailed supervision and oversight by the court. See, e.g., Pantages v. Grauman, 191 F. 317, 323 (9th Cir. 1911) ("[E]quity will not award specific performance where the duty to be enforced is continuous and reaches over a long period of time, requiring constant supervision by the court."); Natural Res. Def. Council, Inc. v. U.S. E.P.A., 966 F.2d 1292, 1300 (9th Cir. 1992) ("Injunctive relief may be inappropriate where it requires constant supervision."); Gamble v. Hanchett, 126 P. 111, 131 (Nev. 1912) ("the duties and obligations . . . involved the exercise of personal direction, management, and control of a continuing character, and no court of equity will undertake the supervision and direction of a continuing activity of this nature."); Carcione v. Clark, 618 P.2d 346, 348 (Nev. 1980) (whether to order specific performance is a matter for the court's discretion and depends in part upon the court's willingness to supervise performance).

The Court declines to engage in the continuous supervision that would be necessary of an order directing that the Golf Course be operated as a business. Were the Court to issue such an order, it is likely that disagreements would arise between the parties relating to issues such as hours of operation, staffing, prices and wages, customer service, tee times, the restaurant menu, and many more. The Court is not willing to engage in the degree of active and ongoing supervision that would be required of such an endeavor. This is unlike the Court's order that Desert Lifestyles maintain the Golf Course, where Desert Lifestyles has the equipment and capability to immediately comply and has the benefit of a list of detailed maintenance standards contained in the Golf Course Agreement that specify how the course must be maintained. The details of the business operation of the Golf Course are not set forth in the same level of detail. Further, the irreparable harm that would otherwise be suffered by Plaintiffs (discussed above) is substantially remedied by an order that Desert Lifestyles water and maintain the Golf Course. An additional requirement that Desert Lifestyles operate the course as a business is not necessary to

1  prevent irreparable harm. Under these circumstances, the Court does not at this time order that

2  Desert Lifestyles reopen or operate the Golf Course as a business. As the Court finds that a

3  mandatory injunction as to the operation of the Golf Course as a business would be

4  inappropriate, the Court need not decide whether the Silverstone HOA would be entitled to

5  pursue such a mandatory injunction.

6      **G. Bond**

7      A court may only issue a preliminary injunction "if the movant gives security in an

8  amount that the court considers proper to pay the costs and damages sustained by any party

9  found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts have

10  discretion in setting the amount of bond. <u>Save Our Sonoran, Inc. v. Flowers</u>, 408 F.3d 1113,

11  1126 (9th Cir. 2004). A likelihood of success on the merits can "tip[] in favor of a minimal bond

12  or no bond at all." <u>People of State of Cal. v. Tahoe Reg'l Planning Agency</u>, 766 F.2d 1319, 1326

13  (9th Cir. 1985).

14      Here, based upon the evidence presented at the preliminary injunction hearing and

15  Plaintiffs' particularly strong likelihood of success on the merits of their claims, the Court finds

16  that a bond of $20,000 is appropriate in this case.

17

18  <u>**ORDER**</u>

19      **IT IS THEREFORE ORDERED** that Defendant Desert Lifestyles, LLC, as well as its

20  officers, agents, employees, and attorneys, and all other persons in active participation with any

21  of them who receive actual notice of this Order, shall restore the Silverstone Golf Course to the

22  condition it would have been in had it received continuous watering and maintenance as of

23  September 1, 2015, and shall thereafter maintain the Golf Course in that condition pending

24  further Order of this Court.

25      **IT IS FURTHER ORDERED** that Plaintiffs shall be required to post security of

26  $20,000. This Preliminary Injunction shall take effect as soon as Defendants receive actual

27  notice of the posting of this security.

28  . . .

1    **IT IS FURTHER ORDERED** that the parties shall submit proposals detailing specific

2    processes for accomplishing the restoration of the Golf Course by **December 1, 2015**. The Court

3    shall hold a hearing on the parties' proposals on **December 17, 2015**.

4

5    DATED: November 10, 2015.

6    _____

7    **RICHARD F. BOULWARE, II**

     **United States District Judge**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28